# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SAM LEE BUCHANAN**
    **Plaintiff,**

  **v.**            **Case No. 14-C-219**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
      **Defendant.**

---

## DECISION AND ORDER

Plaintiff Sam Buchanan seeks judicial review of the denial of his application for social security disability benefits. Plaintiff argued that given his advanced age, limited education, and restrictions related to a back impairment, he should be deemed disabled under the Social Security Administration's Medical-Vocational Guidelines. The administrative law judge ("ALJ") disagreed, finding that plaintiff's back problem created only modest restrictions, and that he retained the ability to perform his past work as a janitor. The Appeals Council denied review, making the ALJ's decision the Commissioner's final word on the matter. See Yurt v. Colvin, 758 F.3d 850, 856 (7th Cir. 2014).

## I. FACTS AND BACKGROUND

### A. Medical Evidence

#### 1. Treatment Records

Plaintiff lacked insurance after he was laid off from his job in 2009 and received much of his treatment at a free clinic sponsored by a Lutheran Church called "Bread of Healing." On July 28, 2010, plaintiff made his first visit to the clinic, complaining of a lump in his right pectoral

area.[1]  Doctors also diagnosed probable mild BPH.[2]  (Tr. at 242.)  He returned on December 21, 2010, with "multiple constitutional complaints."  Dr. Barbara Horner-Ibler ordered various lab tests and noted elevated blood pressure.  (Tr. at 241.)  On January 11, 2011, plaintiff again presented with high blood pressure.  He reported fatigue all day on most days, but he was still able to get daily activities done.  Dr. Horner-Ibler started him on medication for his blood pressure.  For his complaints of chronic pain, moderately controlled with Tylenol, she prescribed Gabapentin (a/k/a Neurontin).[3]  (Tr. at 240.)

On February 15, 2011, plaintiff complained of chronic back pain radiating down the leg, with numbness in the back of the left thigh, unchanged on Gabapentin.  On exam, he had positive straight leg raise bilaterally.[4]  (Tr. at 239.)  Given his increased muscle fatigue and lack of response to Neurontin, plaintiff was encouraged and agreed to make an appointment with physical therapy.  Neurontin was discontinued.  (Tr. at 238.)  On March 16, 2011, clinic personnel noted that plaintiff's blood pressure was well controlled on medication, and that his low back pain was well-controlled with Tylenol.  (Tr. at 237-38.)

---

[1]He also visited the emergency room for this condition on July 18, 2010.  (Tr. at 291.)

[2]Benign prostatic hyperplasia ("BPH") is an enlarged prostate gland.  See http://www.webmd.com/men/prostate-enlargement-bph/benign-prostatic-hyperplasia-bph-to pic-overview.

[3]Gabapentin, an anti-epileptic medication, is also used to treat nerve pain.  See http://www.drugs.com/gabapentin.html.

[4]Straight leg raise ("SLR") tests are done to find the reason for low back and leg pain. If the patient has pain down the back of the leg when the leg is raised, the test is positive (abnormal), meaning that one or more of the nerve roots leading to the sciatic nerve may be compressed or irritated.  The most common cause of compression or irritation of the nerve roots is a herniated disc at the lowest part of the back.  See http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-ov erview.

On April 13, 2011, plaintiff returned for follow up of his back pain, hypertension, and enlarged prostate.  He continued to have musculoskeletal pain, needing about 500 mg of acetaminophen daily to control.  His hypertension was controlled by medication.  For pain, he was to continue using acetaminophen.  (Tr. at 236.)  On May 11, plaintiff complained of back pain radiating down the legs, and he was provided a trial of Naproxen, an anti-inflammatory.[5] (Tr. at 236.)

On May 17, 2011, Dr. Horner-Ibler prepared a physical residual functional capacity ("RFC") report, listing diagnoses of chronic low back pain, hypertension, and BPH, with an "excellent" prognosis.  (Tr. at 247.)  She identified symptoms of chronic back pain, knee pain, and urinary hesitancy.  She indicated that plaintiff's symptoms would never be severe enough to interfere with the attention and concentration required to perform simple work-related tasks.  She also listed no medication side effects.  She opined that he could, in an eight-hour workday, sit for eight hours, stand for two hours, and walk for two hours.  (Tr. at 247.)  He had no manipulative limitations but could not use his right foot for repetitive movements (such as operating foot controls).  He could frequently lift up to 10 pounds, occasionally up to 20, never more.  (Tr. at 248.)  He could frequently reach above shoulder height, occasionally bend and climb, but never squat or crawl.  He also had a mild restriction regarding unprotected heights, but no other hazard-related limitations.  He would need unscheduled breaks during an eight-hour workday related to his need to change positions (e.g., if standing/walking, sit for 10 minutes; if sitting, stand and stretch).  (Tr. at 249.)  In her concluding remarks, Dr. Horner-Ibler stated that plaintiff did not specifically complain of back pain until about seven months after

---

[5]http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

establishing care at the clinic. On exam, he had positive straight leg raise but no other neurological signs. It was recommended that he follow up with physical therapy but he never came to an appointment although several were scheduled. She stated: "Any functional limitation from back pain could likely be resolved by dedicated PT. This patient has no other functional limitations." (Tr. at 250.)

Plaintiff returned to the clinic for follow up on June 8, 2011, primarily complaining of sleep problems. Doctors provided Melatonin as a sleep aid. (Tr. at 235.) On July 12, he complained of low back pain radiating down his legs. Naproxen did not help much, nor did heating pads. He also complained of trouble sleeping. He used the sleep medication (Melatonin) for only three days before stopping because it did not help. On exam, he appeared well but had a very stiff gait when he moved to the table. (Tr. at 234.) He had positive SLR bilaterally and pain on palpation of the low back paraspinal area and right hip, but leg strength and range of motion were normal. (Tr. at 233-34.) He also had diminished sensation in the lower legs and feet bilaterally. Dr. Horner-Ibler continued Naproxen, added Gabapentin, and scheduled another appointment for physical therapy. (Tr. at 233.)

On August 15, 2011, plaintiff went to the emergency room complaining of a rash and lightheadedness. (Tr. at 280.) Exams were essentially normal, and he ambulated well. (Tr. at 281.) Doctors provided Benadryl and Tylenol, and discharged him home in good condition. (Tr. at 282.)

On September 7, 2011, plaintiff returned to Bread of Healing clinic for medication refills, indicating that he felt well and would see the doctor next month. On October 5, 2011, he again came in for medications. (Tr. at 363.)

On October 11, 2011, plaintiff went to the emergency room because of a fall the

4

previous day. He said he had been sitting for a long time, and when he stood he became light-headed, his legs felt weak, and he fell. (Tr. at 275.) Exams were within normal limits. (Tr. at 276.) Doctors listed a diagnosis of lightheadedness, fall, and discharged him home in good condition. (Tr. at 277.)

On November 2, 2011, plaintiff returned to Bread of Healing, complaining of back pain, insomnia, and stress, asking to speak to a psychiatrist. He also reported episodes of dizziness when standing up. (Tr. at 363.) The clinic scheduled an appointment with a psychologist and, for back pain, increased the dose of Gabapentin. (Tr. at 361.) Plaintiff returned on November 20, with continued back pain and lack of sleep. He had not been going to PT. The clinic again increased the Gabapentin dose and discontinued Melatonin due to lack of benefit. (Tr. at 360.) When he returned on January 9, 2012, plaintiff reported that his back pain was stable at 3/10. He reported no other issues, feeling "pretty good." (Tr. at 357.)

On January 16, 2012, plaintiff arrived for his scheduled psychotherapy appointment after several cancellations. He indicated that the pain in his back and legs continued, that his legs had started to shake, and that he forgot things more. He appeared to be depressed and frustrated due to the chronic pain. The therapist noted a diagnosis of "309" – apparently a reference to an adjustment disorder with depressed mood[6] – and a GAF of 50.[7] (Tr. at 357.)

---

[6]http://www.icd9data.com/2013/Volume1/290-319/300-316/309/309.0.htm.

[7]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

On January 24, he again complained of chronic back and right leg pain. He reported that in 1980, when he had insurance, he was told by a doctor that his spinal cord was twisted and he had a slipped disc. He reported a desire to work but because of the chronic pain he could not. The therapist indicated that he appeared to be suffering from an adjustment disorder with mixed anxiety and depressed mood, with a GAF of 50. (Tr. at 357.) On January 30, he again reported chronic pain and walked with the assistance of a cane. The therapist noted the same diagnosis and GAF score. (Tr. at 356.)

On February 9, 2012, plaintiff saw an M.D. at Bread of Healing, reporting severe back pain for which he was taking double doses of Naproxen. The doctor continued Naproxen and Gabapentin and scheduled another appointment with PT, noting that his back pain was stable. (Tr. at 356.)

On February 20, 2012, plaintiff returned for psychotherapy, with continued back pain and feeling more depressed. The therapist noted the same diagnosis and GAF score. (Tr. at 355.) That same day, he was seen for a PT evaluation. (Tr. at 355.) The therapist noted that his signs and symptoms correlated to possible degenerative disc disease. (Tr. at 354.) He reported a pain level of 7/10 (Tr. at 355), but the therapist noted "no distress" (Tr. at 354). The therapist also noted stiff transitions but no significant impairment in gait. (Tr. at 354.) On February 27, during a PT follow up session, plaintiff reported no changes since the last week. The medication had slowed his pain, but it was still pretty constant. He had to leave the session early but agreed to continue the exercises; the therapist agreed to attempt to obtain a traction home unit. (Tr. at 353.)

On March 12, 2012, plaintiff saw his psychotherapist, who noted that he appeared to be suffering from major depressive disorder, with a GAF of 50. (Tr. at 352.) He saw a physical

6

therapist the same day, not feeling well, sick with the flu.  His pain was the same since his last visit.  (Tr. at 352.)  On March 26, he returned to PT, again reporting no change.  (Tr. at 351.)  The therapist educated him on the use of the traction unit, and he reported subjectively feeling better after traction.  (Tr. at 350.)

During a May 8, 2012, session with his psychotherapist, plaintiff reported continued chronic pain in his back, legs, and hip, and walked with a cane.  He also appeared depressed, with GAF of 50.  (Tr. at 349.)  On May 9, plaintiff saw Dr. Horner-Ibler, complaining of back pain for the last two years.  (Tr. at 349.)  She continued Naproxen and Gabapentin.  (Tr. at 348.)

During a May 29, 2012, psychotherapy session, plaintiff reported no change in his situation.  He appeared nervous and depressed, with a GAF 50.  (Tr. at 348.)  He again reported no change during a June 4 session.  The therapist assessed major depressive disorder, with a GAF of 50.  (Tr. at 347.)  On June 11, he again reported no changes.  He appeared to be in some discomfort and moved constantly.  The therapist reported the same diagnosis and GAF.  (Tr. at 347.)  On June 25, he told the therapist he was worried about prostate cancer due to urinary issues.  The therapist recorded the same diagnosis and GAF. (Tr. a 346.)  On July 9, he again reported no change in his condition.  He indicated that pain kept him from doing activities.  The therapist recorded the same diagnosis and GAF.  (Tr. at 346.)[8]  Notes from his July 23 psychotherapy session recorded the same.  (Tr. at 346.)  On August 6, plaintiff told the therapist he had moved out of his apartment because it was infested with bed bugs, staying with friends.  He felt fatigued, depressed, and hopeless.  (Tr. at 344.)

Plaintiff also saw an M.D. on August 6, 2012,  for follow up of his back pain and a new

_____

[8]That same day, he also saw an M.D. for dysuria (Tr. at 345) of unclear etiology (Tr. at 344).  The doctor ordered tests.  (Tr. at 344.)

complaint of lightheadedness. Plaintiff reported experiencing intermittent lightheadedness for the past six to seven months, indicating that he had fallen on several occasions due to the hypotension. He reported that he had been hospitalized for this three to four months ago, receiving a cardiac work-up, which came back normal. He also reported that his back pain had worsened in the last few months. He stated that the pain interfered with his ability to find work. He asked for help applying for disability, and indicated that the pain contributed to his depression. On exam, he had diffuse tenderness to palpation of the spinous processes, spasm of the thorocolumbar paraspinous muscles, and decreased range of motion on back flexion. (Tr. at 343.) The doctor believed plaintiff's hypotension was likely due to his medications, discontinuing Enalapril.[9] Regarding back pain, plaintiff had already tried PT and continued to do the back exercises but reported minimal relief. The doctor continued with current management. Plaintiff's dysuria had resolved. (Tr. at 341.)

On August 20, 2012, plaintiff returned to see his psychotherapist, reporting minimal relief from Gabapentin and Naproxen. His back and leg pain continued to be chronic, interfering with his ability to be employed. (Tr. at 342.)

On August 30, 2012, plaintiff went to the emergency room following a motor vehicle accident. He reported that he was a passenger on a city bus, which was struck by a Jeep, causing minimal damage to the Jeep and no damage to the bus. Plaintiff reported neck and back pain, stating he had a history of both. He noted no numbness or weakness of the extremities. (Tr. at 270.) Neurological exam was normal. Skin over the lower back and posterior neck was intact without visible abrasion or laceration, but he had pain over both

---

[9]Enalapril is used to treat high blood pressure (hypertension) and congestive heart failure. http://www.drugs.com/enalapril.htm.

areas. (Tr. at 271.) X-rays showed mild degenerative change at C5-6 and scattered degenerative changes of the lumbar spine, but no fractures. (Tr. at 273-74.) Doctors diagnosed neck sprain and low back pain, providing Hydrocodone-acetaminophen and Cyclobenzaprine,[10] discharging plaintiff home in good condition. (Tr. at 271-72.)

On September 8, 2012, plaintiff returned to the emergency room complaining of vertigo over the past day. He reported drinking a "couple" beers the previous day. (Tr. at 266.) He reported taking various medications, including Cyclobenzaprine, Hydrocodone-acetaminophen, Naproxen, and Gabapentin. Neurological and mental status exams were normal. (Tr. at 267.) He reported no headache, neck, low back, or abdominal pain. Neurological and musculoskeletal exams were normal. (Tr. at 268.) Doctors diagnosed benign paroxysmal positional vertigo, providing Antivert,[11] and discharging him home in good condition. (Tr. at 269.)

On September 10, 2012, plaintiff saw his psychotherapist, relating his recent accident while on the bus. He said he felt sore and stiff. (Tr. at 342.)

On October 9, 2012, plaintiff saw David Osterwind, PA-C, at the MLK Heritage Health Center (another free clinic), complaining of back pain, significantly worse in the last few weeks after the accident. He had been to the ER on the date of the injury and had been seeing a chiropractor for a couple weeks, with no relief in back pain.[12] (Tr. at 299.) On

---

[10]Cyclobenzaprine is a muscle relaxant. http://www.drugs.com/cyclobenzaprine.htm.

[11]Antivert is used to treat or prevent nausea, vomiting, and dizziness caused by motion sickness. It is also used to treat symptoms of vertigo (dizziness or spinning sensation). http://www.drugs.com/antivert.html.

[12]Plaintiff received treatment at Pyramid Chiropractic Clinic (Dr. Yusuf) in the fall of 2012. (Tr. at 315-33.) On October 24, 2012, plaintiff saw Neal Pollack, DO, on referral from Dr.

musculoskeletal/orthopedic exam, he was noted to ambulate well with mild pain response to palpation of the paraspinals.  He had good bilateral strength and range of motion.  PA Ostwerwind assessed muscle strain and low back pain, providing the pain reliever Tramadol.[13] (Tr. at 300.)

On October 9, 2012, plaintiff saw his psychotherapist.  He noted seeing a chiropractor since his accident.  He continued to have financial issues and walked with a cane.  This note listed no diagnosis or GAF score.  (Tr. at 340.)

On November 5, 2012, plaintiff returned to Bread of Healing for follow up of his chronic low back pain.  He reported using occasional Vicodin he obtained from a friend.  He also reported some episodes of vertigo.  The note stated: "did not make PT appt."  (Tr. at 339.)  He was seeing a chiropractor and had been to the MLK Clinic.  He was told that he needed to choose between MLK and Bread of Healing.  (Tr. at 339.)  He also saw his psychotherapist the same day, reporting no changes.  (Tr. at 339.)

On November 15, 2012, plaintiff saw Dr. Reginald Adams at the MLK Center, reporting constant low back pain and no medications.  Under social history, his employment status was listed as unemployed and his exercise/recreational activities as weight lifting.  (Tr. at 301.)  On musculoskeletal/orthopedic exam, he had good bilateral strength and range of motion.  On

_____

Yusuf, with a chief complaint of neck, low back, and right leg pain.  Plaintiff reported that he had neck and back pain prior to the August 30, 2012 accident, for which he was going to the free clinic, but it worsened after the accident.  (Tr. at 332.)  On exam, plaintiff had moderate restriction of all lumbar motions, but he was able to cross one leg over the other and had normal sitting straight leg raising responses.  Dr. Pollack assessed spinal strains, recommending lumbar support, effortless spinal and extremity exercises, and continued chiropractic treatment.  He also provided Cyclobenzaprine.  (Tr. at 333.)

[13]See http://www.drugs.com/tramadol.html.

psychiatric exam, he was cooperative/communicative and without depression/anxiety. (Tr. at 302.) Dr. Adams assessed stable BPH, stable cervicalgia, and stable low back pain. (Tr. at 302-03.) Dr. Adams ordered labs and x-rays, continued Terazosin for hypertension,[14] and started Tramadol. (Tr. 303.) The cervical scan showed slight disc narrowing at C5-6, but the remainder of the cervical spine was normal. The lumbar scan was normal. (Tr. at 298.)

On December 11, 2012, plaintiff saw his psychotherapist, reporting very little relief from medications. He walked with the assistance of a cane. (Tr. at 338.)

### 2. Agency Consultants

After plaintiff filed his application for benefits, the agency arranged for an orthopedic consultative examination and had the claim reviewed by two medical consultants.

On January 19, 2011, Brandon Rebholz, M.D., performed the orthopedic evaluation, listing chief complaints of back pain, right knee pain, and vision difficulties. Plaintiff reported a two to three year history of low back pain radiating to his right leg. The pain was worse with walking and nothing made it better. He had never tried any physical therapy, injections, or medications. He reported no numbness, tingling, or weakness. He also complained of right knee pain, which he described as popping and occasionally giving way but no locking. The pain was worse going up and down stairs. (Tr. at 212.)

On exam, plaintiff had full painless active range of motion of the cervical spine, and no tenderness to palpation in the midline or paraspinous musculature. He displayed full painless active extension and lateral bending of the thoracic and lumbar spine, although he was only able to forward flex to the mid tibia. He had mild tenderness to palpation in the lower lumbar

---

[14]http://www.drugs.com/terazosin.html.

spine. He had full painless active range of motion of the bilateral upper and lower extremities. (Tr. at 213.) He had mild tenderness to palpation with patellofemoral grind of the right knee. (Tr. at 213-14.) He ambulated with normal heel-toe gait pattern and was able to demonstrate a toe-to-toe and heel-to-heel gait pattern, and did so without an assistive device. He was easily able to rise from the chair and get on and off the exam table. He had negative straight leg raise. X-rays revealed mild multi-level degenerative disc disease with mild loss of disc height from L3-4, L4-5, and L5-S1. An x-ray of the right knee revealed no significant degeneration or abnormality. (Tr. at 214.)

Dr. Rebholz diagnosed axial low back pain with questionable radicular features secondary to multi-level degenerative disc disease. (Tr. at 214.) He concluded:

> As far as this pain is concerned, he is certainly able to function at relatively high levels, sitting for two to three hours, standing one to two hours, and walking two to three blocks at a time. Treatment for axial low back pain with multilevel degenerative disc disease is essentially symptomatic with occasional use of oral antiimflammatories and over-the-counter pain medication such as acetaminophen. He should also participate in the core strengthening and stretching program. He would have no restrictions from his bilateral upper or lower extremities and I would anticipate that he be able to work 8 hours in an 8-hour workday. He did have visual acuity tested today with his glasses on, the right eye was 20/40, the left eye 20/40, and both eyes 20/30.

(Tr. at 214-15.)

On March 1, 2011, Pat Chan, M.D., completed a physical RFC assessment, finding plaintiff capable of medium work with no other limitations. (Tr. at 216-23.) On September 19, 2011, Syd Foster, M.D., completed a physical RFC report reaching the same conclusion. (Tr. at 254-61.) Dr. Foster noted that plaintiff had normal exams aside from positive SLR and subjective pain complaints, with normal range of motion, strength, and sensation. He also had minimal treatment and failed to follow through on PT, which his treating doctor believed could

resolve his complaints.  Given his subjective pain complaints and mild degenerative disc disease, Dr. Foster found a medium RFC appropriate.  (Tr. at 261.)

## B.    Administrative Proceedings

### 1.    Plaintiff's Application and Supporting Materials

Plaintiff applied for benefits on December 8, 2010, alleging a disability onset date of September 18, 2009.  (Tr. at 117.)  In his disability report, he wrote: "Eyes going bad and everything else is wrong with me too."  (Tr. at 140.)  He indicated that he stopped working on September 18, 2009, because he was laid off and because of his condition.  (Tr. at 140.)  He reported working as a janitor for commercial cleaning services from 1993 to 2009.  (Tr. at 141, 149.)

In a function report, plaintiff indicated that he sat or laid around all day.  (Tr. at 161.)  He reported no problems with personal care (Tr. at 162) and prepared his own meals but stated that he could not do house or yard work(Tr. at 163) due to pain (Tr. at 164).  He got out every day, which he was able to do alone, using public transportation.  He was able to handle money and pay bills.  (Tr. at 164.)  He listed watching TV as a hobby.  He sometimes visited a friend (Tr. at 165) and reported no problems getting along with others (Tr. at 166).  He stated that he could lift five to ten pounds and walk ½ block before he had to stop and rest.  (Tr. at 166.)  He used a cane and glasses.  (Tr. at 167.)

In a physical activities addendum, plaintiff stated that he slept four hours per night due to pain and took a one hour nap during the day.  He wrote that in a day he could sit ½ hour, stand ½ hour, and walk "not long."  (Tr. at 169.)  Asked if he ever lost a job because of his condition, he checked "no."  (Tr. at 169.)

The agency denied the application initially (Tr. at 48, 50), and plaintiff requested reconsideration (Tr. at 56-57). In a subsequent function report, plaintiff wrote that his back and legs hurt when standing for long. He further indicated that his eyesight was very bad to the point where he got bad headaches requiring him to lay down. He also reported problems with his blood pressure. (Tr. at 182.) He checked "no problem" in handling his personal care (Tr. at 183), indicated that he prepared his own meals daily, which took about 10 minutes; and reported that he did laundry, which took about 30 minutes (Tr. at 184). He went outside every day if he felt good and shopped every other week. (Tr. at 185.) He again listed watching TV as a hobby and said that he spent time with friends once or twice per week. (Tr. at 186.) He indicated that he could walk for 10 minutes before he had to stop and rest, and could pay attention for 15 minutes. (Tr. at 187.) In this report, plaintiff indicated that he had been fired from a job because of problems getting along with people, identifying "Social Security Building" as the employer,[15] further stating that he did not handle stress or changes in routine well. In this report, plaintiff indicated that he used glasses but did not check use of a cane. (Tr. at 188.) He listed various medications, including Gabapentin and Naproxen, which caused no side effects. (Tr. at 189.)

In a physical activities addendum, plaintiff indicated that he slept three to four hours per night because of pain, then spent about half of the day in bed. Asked how long he could sit, stand, or walk without a break, he wrote "none." (Tr. at 190.)

The agency denied plaintiff's request for reconsideration (Tr. at 49), so plaintiff requested a hearing before an ALJ (Tr. at 66).

---

[15]At the hearing, plaintiff testified that he cleaned the building housing the Social Security Administration while working for a private contractor. (Tr. at 36.)

## 2. The Hearing

On November 29, 2012, plaintiff appeared with a non-attorney representative for his hearing before the ALJ. The ALJ also summoned a vocational expert ("VE"), Jacquelyn Wenkman. (Tr. at 30.) Consistent with his general policy of not awarding benefits to claimants while they are collecting unemployment compensation, the ALJ noted that the earliest onset date would be April 1, 2011 (Tr. at 34), and plaintiff's representative later moved to amend the onset date to April 1, 2011 (Tr. at 37).[16] The ALJ also held the record open for 30 days for submission of additional records. (Tr. at 33.)

### a. Plaintiff

Plaintiff testified that his date of birth was September 19, 1952. He made it as far as the eighth grade in school and never obtained a GED. (Tr. at 35.) He last worked as a janitor in 2009, when he was laid off. He collected unemployment until 2011, with no income since that time. He relied on a friend and food stamps. (Tr. at 36.)

Plaintiff testified that he could not work due to constant pain, inability to bend, and trouble standing for long periods. (Tr. at 37-38.) He indicated that he spent most of his time laying down. He used a cane to relieve some of the pressure when he walked. (Tr. at 38.) He indicated that he used a variety of medications, but they did not help. (Tr. at 38-39.) He shopped maybe once per month with a friend but did not visit friends very often. (Tr. at 39-40.) He attended weekly counseling sessions for depression. (Tr. at 39-40.)

Plaintiff testified that in an eight-hour period he could sit for two hours, stand for two

---

[16]Plaintiff raises no issue with the ALJ's comment or the amended onset date. See Scrogham v. Colvin, 765 F.3d 685, 699 (7th Cir. 2014) (noting that ALJs may give some consideration to a claimant's receipt of unemployment compensation but must do so with significant care and circumspection).

hours, and walk about one hour; he spent the rest of the time laying down. He indicated that he had pain all over, not just in his back. (Tr. at 40.) He said he did nothing but sit or lay around the house. He had recently joined a church, which was putting together a men's group. For recreation, he watched TV. (Tr. at 46.)

### b. VE

The VE classified plaintiff's past job as a janitor as medium, semi-skilled work. (Tr. at 42.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work history, limited to medium work with additional limitations of no hazards, no driving, no climbing of ropes, ladders, or scaffolds, and no unusual balancing. The VE testified that such a person would do plaintiff's past work. (Tr. at 43.) Adding a limitation of no fine visual acuity, the answer was the same. (Tr. at 43-44.) However, if the person could never squat or crawl, or only occasionally bend, the janitor job could not be done. (Tr. at 44-45.)

### 3. ALJ's Decision

On January 17, 2013, the ALJ issued an unfavorable decision. (Tr. at 8.) Following the familiar five-step sequential evaluation process,[17] the ALJ determined at step one that plaintiff had not worked since April 1, 2011, the amended onset date, and at step two that he suffered from the severe impairment of a lumbar disorder. The ALJ noted medical references to other conditions, including decreased vision, occasional vertigo, hypertension, a mildly enlarged

---

[17]Under this inquiry, the ALJ asks (1) whether the claimant is currently employed; (2) if not, whether the claimant has a "severe" impairment or impairments; (3) if so, whether the claimant's impairment is one that the Commissioner considers conclusively disabling under the Listings; (4) if not, whether the claimant retains the residual functional capacity ("RFC) to perform his past relevant work; and (5) if not, whether the claimant can, given his age, education, work history, and RFC, perform any other work in the national economy. See 20 C.F.R. § 404.1520(a)(4).

prostate, and insomnia, but concluded that none were severe. (Tr. at 13.) The ALJ further noted that plaintiff had been diagnosed with depression, but plaintiff did not allege and the record did not reflect any disabling effects of depression. The ALJ noted that plaintiff received treatment from a social worker, but there was no indication that he required prescription medication. Considering the four broad functional areas in the mental impairment regulations, the ALJ found no limitation in plaintiff's abilities to engage in activities of daily living, function socially, or maintain concentration, persistence, and pace. (Tr. at 14.) At step three, the ALJ concluded that plaintiff's back impairment did not meet Listing 1.04. (Tr. at 14-15.)

The ALJ then determined that plaintiff retained the RFC for medium work that did not require him to drive, be exposed to hazards, crawl, climb ropes, ladder or scaffolds, engage in unusual balancing or use fine visual acuity, or engage in more than occasional squatting or frequent stooping. In making this determination, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 15.)

Plaintiff alleged that due to his impairments he could not lift more than five to ten pounds; had difficulty squatting, bending, kneeling, and climbing stairs; was unable to walk more than a half block or 20 minutes before needing to rest for 10 minutes; and could not sit for more than three hours or stand for more than one hour. The ALJ stated:

> After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the alleged intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence or a finding of total disability.

(Tr. at 15.)

The ALJ first noted that the medical records failed to fully substantiate plaintiff's allegations of disabling symptoms. For instance, in October 2012, Dr. Pollack diagnosed

17

plaintiff with a spinal strain, which was consistent with diagnostic imaging showing only mild changes in plaintiff's spine. (Tr. at 15.) Imaging of plaintiff's cervical spine taken following the August 2012 auto accident also showed just mild degenerative changes. (Tr. at 15-16.)

Second, while clinical exams at times revealed reduced range of motion, stiff gait, and positive straight leg raise, more recent records from the fall of 2012 suggested improvement. For example, in October 2012, plaintiff sought urgent care treatment for low back pain, but treating providers noted that he ambulated well, had mild pain response to palpation of the lumbar paraspinals, and demonstrated good bilateral strength and range of motion in both upper and lower extremities. Also in October 2012, Dr. Pollack noted that despite moderate restriction in his lumbar range of motion, plaintiff was able to cross one leg over the other and had normal straight leg response. In November 2012, Dr. Adams noted that plaintiff was not on any medication and had good bilateral strength and range of motion. Dr. Adams indicated that plaintiff's pain was stable and prescribed Tramadol. The ALJ also noted inconsistencies between plaintiff's reported pain levels and his pain behaviors was during appointments with therapists in 2012. (Tr. at 16.)

Third, claimant's treatment had been conservative, consisting of Tylenol and prescription medications such as Gabapentin and Naproxen. He saw a chiropractor in September 2012, but reported no relief. His treating physician, Dr. Horner-Ibler, noted that he had been referred for physical therapy but failed to follow through. Subsequent notes indicate that he was seen for an evaluation in February 2012 but did not follow through with therapy after one to two visits. The ALJ noted that in order to receive benefits a claimant must follow prescribed treatment if it could restore his ability to work, and Dr. Horner-Ibler expressly noted that plaintiff's functional limitations from back pain could likely be resolved by dedicated physical

18

therapy, which the records indicate was provided through plaintiff's free clinic. The ALJ concluded that plaintiff's failure to follow through with therapy, coupled with the lack of any reference to more aggressive treatment, suggested that plaintiff's symptoms and limitations were not as severe as alleged. Finally, while treating providers noted plaintiff's use of a cane, his need for it was questionable, as he indicated it was not prescribed and the consultative examiner, Dr. Rebholz, noted that he ambulated with a normal gait pattern without it. (Tr. at 16.)

Fourth, the ALJ noted that Dr. Rebholz conducted a complete orthopedic evaluation, noting negative straight leg raise, full painless range of motion in the cervical spine, full painless active extension and lateral bending of the thoracic spine, and mild tenderness of the lumbar spine on palpation. (Tr. at 16-17.) Plaintiff had normal gait pattern and was able to demonstrate toe-to-toe and heel-to-heel gait patterns without an assistive device. He was able to easily rise from his chair, as well as get on and off the examination table. (Tr. at 17.)

Fifth, the ALJ noted that plaintiff described daily activities that were not limited to the extent one would expect given his complaints of disabling symptoms and limitations. He reported no problems tending to personal care, prepared meals daily, did housework, laundry, and grocery shopping. He was able to manage money and follow instructions. He reported that he went out daily if feeling well and was able to do so unassisted. He watched television every day, visited with friends once or twice per week, and had just joined a church, which was putting together a men's group. (Tr. at 17.)

The ALJ then turned to the opinion evidence, giving great weight to the opinions of the medical consultants, Drs. Chan and Foster, who opined that plaintiff could perform medium work. The ALJ also gave great weight to the opinion of the consultative examiner, Dr. Rebholz,

19

who noted that despite back pain plaintiff was "certainly able to function at relatively high levels, sitting for two to three hours, standing for one to two hours and walking two to three blocks at a time." (Tr. at 17.)  Dr. Rebholz further opined that plaintiff would have no restrictions from his arms or legs, and that he would be able to work eight hours in an eight-hour workday.  The ALJ found that Dr. Rebholz's opinion was consistent with the overall record, including the objective medical evidence, as well as the opinions of Drs. Chan and Foster.  (Tr. at 17.)

The ALJ gave "some weight" to the May 2011 opinion of plaintiff's treating physician, Dr. Horner-Ibler.  (Tr. at 17.)  She opined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds; and, in an eight-hour workday, sit for eight hours, stand for two hours, and walk for two hours.  She further opined that he could not squat, crawl, or operate foot controls with his right foot.  He could occasionally bend and climb, and frequently reach above shoulder level.  Finally, she opined that he would need to take unscheduled breaks and change positions.  Notably, she indicated that his prognosis was excellent, and that "any functional limitation from back pain could likely be resolved by dedicated physical therapy." (Tr. at 17.) However, she noted that plaintiff had not followed through with physical therapy despite having several scheduled appointments.  (Tr. at 17-18.)  The ALJ found that her opinion was not consistent with the objective medical evidence, which was largely unremarkable and did not substantiate plaintiff's allegations of disabling back pain.  The ALJ concluded that her opinions were likely based on plaintiff's subjective complaints.  Nevertheless, the ALJ accommodated to some extent those limitations noted by Dr. Horner-Ibler insofar as they were reasonably supported by the record. (Tr. at 18.)

Based on this RFC, the ALJ concluded at step four that plaintiff was capable of performing his past relevant work as a janitor.  The VE testified that a person of plaintiff's

characteristics and with the RFC the ALJ set could perform this work as actually performed by plaintiff and as generally performed in the economy. (Tr. at 18.) The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 18-19.)

The Appeal Council denied review on January 2, 2014. (Tr. at 1.) This action followed.

## II. STANDARD OF REVIEW

The court reviews an ALJ's decision to ensure that he supported it with substantial evidence and applied the correct legal criteria. Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Moore v. Colvin, 743 F.3d 1118, 1120-21 (7th Cir. 2014). Under this deferential standard, the court may not re-weigh the evidence or substitute its own judgment for that of the ALJ; if reasonable minds could differ over whether the claimant is disabled, the court must uphold the decision under review. Shideler v. Astrue, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence. Id.

## III. PLAINTIFF'S CLAIMS OF ERROR

Plaintiff argues that the ALJ failed to assign appropriate weight to Dr. Horner-Ibler's report, erred in finding his mental impairment non-severe, and improperly evaluated credibility. I address each argument in turn.

## A. Treating Source Report

### 1. Legal Standards

The opinion of a social security claimant's treating doctor is entitled to "special

significance" in determining RFC, SSR 96-8p, 1996 WL 374184, at *7, and will be given "controlling weight" if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011). If the opinion does not meet the test for controlling weight, the ALJ must determine what value the assessment does merit, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. Id. at 740. The ALJ must always offer "good reasons" for discounting a treating source opinion. Id. at 739.

"However, 'while the treating physician's opinion is important, it is not the final word on a claimant's disability.'" Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996) (quoting Reynolds v. Bowen, 844 F.2d 451 (7th Cir. 1988)). The ALJ, not a doctor selected by a patient to treat him, ultimately decides whether a claimant is disabled. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). While the regulations provide that more weight will generally be given to the opinion of a treating physician than that of a consultant, see 20 C.F.R. § 404.1527(c), the ALJ must consider that a treating source opinion may be unreliable if the doctor is sympathetic with the patient and thus too quickly finds disability, Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008). "Accordingly, if the treating physician's opinion is inconsistent with the consulting physician's opinion, internally inconsistent, or based solely on the patient's subjective complaints, the ALJ may discount it." Id.

### 2. Analysis

In this case, treating physician Dr. Horner-Ibler imposed restrictions that essentially limited plaintiff to a range of sedentary work; if accepted, this would result in a finding of disability under the Medical-Vocational Guidelines. See 20 C.F.R. 404, Subpt. P, App. 2, Rules

22

201.02, 201.02, 202.01, & 202.02.  For several reasons, however, the ALJ discounted Dr. Horner-Ibler's opinion.  First, the ALJ noted that Dr. Horner-Ibler listed plaintiff's prognosis as "excellent," stating that "any functional limitation from back pain could likely be resolved by dedicated physical therapy."  (Tr. at 17, 250.)  But plaintiff had not followed through with physical therapy despite having several scheduled appointments.  (Tr. at 17-18.)  Second, the ALJ found that Dr. Horner-Ibler's opinion was inconsistent with the objective medical evidence, which was largely unremarkable and did not substantiate plaintiff's allegations of disabling back pain.  Third, the ALJ concluded that Dr. Horner-Ibler's opinions were likely based on plaintiff's subjective complaints.  (Tr. at 18.)  Finally, the ALJ credited the opinions of the agency consultants, who found that plaintiff could "function at relatively high levels" and perform the requirements of medium work.  (Tr. at 17.)

In attacking this determination, plaintiff first takes issue with the ALJ's characterization of the objective evidence as "largely unremarkable," noting the exam findings of lumbar tenderness, restricted range of motion, positive SLR tests, and stiff gait with use of a cane. The ALJ specifically acknowledged that the clinical exams at times produced such findings, but he noted that other records were to the contrary.  (Tr. at 16.)  He specifically cited exams where plaintiff ambulated well, had mild pain response to palpation of the lumbar paraspinals, demonstrated good bilateral strength and range of motion, was able to cross one leg over the other and had normal straight leg response, had good bilateral strength and range of motion, was able to sit and move without obvious discomfort, and his gait revealed no significant impairment.  (Tr. at 16.)  Where, as here, the ALJ fairly considered the evidence that supports, as well as the evidence that detracts from, the applicant's claim, the reviewing court may not re-weigh the evidence or otherwise second guess the ALJ's determination.  See Shideler, 688

F.3d at 310; Cass v. Shalala, 8 F.3d 552, 554-55 (7th Cir. 1993); see also Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001) ("[F]rom the ALJ's findings it is clear that she thoroughly reviewed all the evidence and did exactly what she was supposed to do: determine credibility and weight.").

Plaintiff next contends that the ALJ relied on conjecture in finding that Dr. Horner-Ibler likely based her opinion on subjective complaints. However, an ALJ may reasonably draw such an inference where the objective evidence fails to support the claimed restrictions. See Ketelboeter, 550 F.3d at 625. The ALJ also properly considered the mixed signals Dr. Horner-Ibler sent in this report. On the one hand, she imposed restrictions consistent with sedentary work, but she also listed plaintiff's prognosis as "excellent" and opined that "any functional limitation from back pain could likely be resolved by dedicated [physical therapy]," with which plaintiff failed to follow through.[18] (Tr. at 17-18, 250.) The ALJ may reasonably give less weight to a report in which the doctor expresses doubts about the claimant's allegations, yet still finds disability. See Ketelboeter, 550 F.3d at 625.

Finally, plaintiff attacks the ALJ's reliance on Dr. Rebholz's consultative exam. As indicated, Dr. Rebholz found that plaintiff "is certainly able to function at relatively high levels, sitting for two to three hours, standing one to two hours, and walking two to three blocks at a time." (Tr. at 17, 214.) Plaintiff asserts that this is actually consistent with Dr. Horner-Ibler's limitation to sedentary work. However, Dr. Rebholz never found plaintiff limited to sitting or standing for just a few hours total in an eight hour day, as Dr. Horner-Ibler did. His statement instead addressed continuous sitting, standing, and walking. Plaintiff argues that Dr. Rebholz's

---

[18]Plaintiff contends that he eventually did follow through with PT. I discuss this contention in section C below.

opinion that he functioned "at relatively high levels" was too vague to rely upon, but to the extent that is so the ALJ reasonably relied on the reports from the consultants, Drs. Chan and Foster, who specifically found plaintiff capable of medium work. Plaintiff provides no reason why the ALJ could not rely on those reports. See SSR 96-6p, 1996 WL 374180, at *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act.").

In sum, the ALJ reasonably discounted Dr. Horner-Ibler's report because it was inconsistent with the objective medical evidence, based on plaintiff's subjective complaints, internally inconsistent, and inconsistent with the opinions of the consultants. Because these are "good reasons," plaintiff's argument must be rejected. See Ketelboeter, 550 F.3d at 625; see also Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007) ("An ALJ thus may discount a treating physician's medical opinion if it the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.'") (quoting Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004)).

## B.    Mental Impairment

### 1.    Legal Standards

At step two of the sequential evaluation process, the ALJ determines whether the claimant suffers from severe impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); see also Moore, 743 F.3d at 1121 ("If the evidence indicates that an impairment is a slight abnormality that has no more than a minimal effect on an individual's ability to work, then it is

not considered severe for Step 2 purposes."). "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even <u>one</u> severe impairment." <u>Arnett v. Astrue</u>, 676 F.3d 586, 591 (7th Cir. 2012). If the ALJ finds a severe impairment and continues with the process, any error at step two may be deemed harmless if the ALJ accounted for all of the claimant's limitations in determining RFC. <u>See id.</u>; <u>see also</u> <u>Terry v. Astrue</u>, 580 F.3d 471, 477 (7th Cir. 2009) ("[A]n ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").

### 2. Analysis

In the present case, the ALJ considered all of the potential impairments referenced in the medical records. He specifically addressed plaintiff's diagnosis of depression but found it non-severe. The ALJ first noted that plaintiff did not allege, and the record did not reflect, any disabling effects of depression. The ALJ further noted that while plaintiff saw a social worker for treatment of his depression, there was no indication that he required treatment with prescription medication. The ALJ then considered the functional areas set out in the regulations for evaluating mental disorders, finding no limitation in plaintiff's abilities to engage in activities of daily living, function socially, or maintain concentration, persistence, and pace. (Tr. at 14.)

In claiming error on this point, plaintiff first takes issue with the ALJ's reference to "disabling effects," noting that an impairment need not be individually disabling to be severe. However, the reviewing court reads the ALJ's opinion as a whole and with common sense, <u>Buckhanon ex rel. J.H. v. Astrue</u>, 368 Fed. Appx. 674, 678-79 (7th Cir. 2010) (citing <u>Rice v. Barnhart</u>, 384 F.3d 363, 369 (7th Cir. 2004); <u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir.

2000)), rather than nitpicking at it, <u>Castile v. Astrue</u>, 617 F.3d 923, 929 (7th Cir. 2010). The ALJ applied the correct legal standard when he found the impairment non-severe based on his evaluation of the four broad functional areas. <u>See</u> 20 C.F.R. § 404.1520a(d)(1) (noting that if the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, he may generally conclude that the impairment is not severe).

Plaintiff argues that he did allege, and the record did contain evidence of, significant functional limitations related to his depression. He notes his diagnosis of depression, which may have caused his insomnia; his reports of frustration, forgetfulness, and worry to his psychotherapist; and the psychotherapist's diagnoses and GAF scores of 50. He further notes that, in his function reports, he alleged issues with concentration, changes in routine, and social withdrawal.

The ALJ cited the pre-hearing brief submitted by plaintiff's representative in finding that plaintiff failed to allege disability based on depression. (Tr. at 14, 200-03.) While this did not relieve the ALJ of his duty to consider the possible effects of depression (as he, in fact, did), it was a reasonable observation; an ALJ may presume that a represented claimant is making his best case for benefits.[19] <u>Pepper v. Colvin</u>, 712 F.3d 351, 367 (7th Cir. 2013). Further, while the ALJ did not discuss all of the evidence plaintiff now cites on this point, he did consider plaintiff's treatment with the therapist, discussing those notes at various points in his decision. (Tr. at 14, 16.) "The ALJ need not . . . discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability."

---

[19]In one of his function reports, plaintiff alleged problems with stress and changes in routine, but he did not link them to depression. (Tr. at 188.) In the same report, he indicated that he socialized less because of pain (not depression). (Tr. at 187.)

Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010).

Plaintiff faults the ALJ for failing to specifically discuss the GAF scores assigned by his therapist. While GAF scores can be relevant, see, e.g., Yurt, 758 F.3d at 860 (citing Bates v. Colvin, 736 F.3d 1093, 1100 (7th Cir. 2013)), "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (internal quote marks omitted).[20] While the therapist repeatedly recorded a GAF score of 50, at no time did she set forth any specific functional limitations related to plaintiff's depression. Indeed, plaintiff points to no medical evidence supporting any limitations related to depression, nor does he suggest how the ALJ should have modified the RFC to account for depression. Instead, he relies on the depression diagnosis and his reported symptoms, "but the existence of [this diagnosis] and symptoms does not mean the ALJ was required to find that [he] suffered disabling impairments." Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007). In the absence of any evidence of restrictions related to depression, any error in finding this impairment non-severe as step two was harmless.

## C.    Credibility

### 1.    Legal Standards

In assessing the credibility of a claimant's statements, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. SSR 96-7p, 1996 WL 374186, at *2. If the

---

[20]"The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Williams v. Colvin, 757 F.3d 610, 613 (7th 2014) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

claimant suffers from no such impairment(s), or if the impairment(s) could not reasonably be expected to produce the claimant's symptoms, the symptoms cannot be found to affect his ability to work. Id. If the ALJ finds that the claimant's impairment(s) could produce the symptoms alleged, he must then determine the extent to which the symptoms limit the claimant's ability to work. Id. For this purpose, whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record, including the claimant's daily activities; the duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and any other measures or treatment the claimant uses to relieve the symptoms. Id. at *2-3.

The reviewing court gives special deference to an ALJ's credibility determination and will not overturn it unless it is patently wrong. Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013). While the ALJ must provide "specific reasons" for his finding, he need not run through all of the factors set forth in SSR 96-7p in checklist fashion. See, e.g., Clay v. Apfel, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999). Ultimately, the court will affirm so long as the ALJ explained his decision in such a way that allows the court to determine whether he reached his decision in a rational manner, logically based on his specific findings and the evidence in the record. McKinzey v. Astrue, 641 F.3d 884, 890 (7th Cir. 2011).

**2. Analysis**

In the present case, the ALJ followed the two-step process set forth in SSR 96-7p. After summarizing plaintiff's allegations, the ALJ stated that "the claimant's medically determinable

29

impairments could reasonably be expected to cause the alleged symptoms; however, the alleged intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence or a finding of total disability." (Tr. at 15.) He then provided several reasons for his finding. First, he noted that the medical records failed to fully substantiate plaintiff's allegations of disabling symptoms, with diagnostic imaging showing only mild changes in plaintiff's spine. (Tr. at 15.) Second, while clinical exams at times revealed reduced range of motion, stiff gait, and positive straight leg raise, more recent records suggested improvement. The ALJ also noted inconsistencies between plaintiff's pain complaints and his behavior during exams. (Tr. at 16.) Third, the ALJ noted plaintiff's conservative treatment, as well as his failure to follow though on the physical therapy recommended by Dr. Horner-Ibler. (Tr. at 16.) Fourth, the ALJ noted that Dr. Rebholz conducted a complete orthopedic evaluation, noting negative straight leg raise, full painless range of motion in the cervical spine, full painless active extension and lateral bending of the thoracic spine, and mild tenderness of the lumbar spine on palpation. (Tr. at 16-17.) Fifth, the ALJ noted that plaintiff described daily activities that were not limited to the extent one would expect given his complaints of disabling symptoms and limitations. (Tr. at 17.)

Plaintiff first contends that the ALJ used boilerplate credibility language repeatedly condemned by the Seventh Circuit. In this case, the ALJ wrote:

> After consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the alleged intensity of the symptoms and their impact on functioning are not consistent with the totality of the evidence or a finding of total disability.

(Tr. at 15.) The credibility "template" the Seventh Circuit has condemned is different:

> "After careful consideration of the evidence, the undersigned [administrative law

30

judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

Bjornson v. Astrue, 671 F.3d 640, 644 (7th Cir. 2012) (quoting an ALJ's decision); see also Feyen v. Colvin, No. 13-C-1380, 2014 WL 4494524, at *5 (E.D. Wis. Sept. 11, 2014) (same language). The primary problem with the boilerplate quoted from Bjornson is that it backwardly implies that RFC is determined first, and the claimant's testimony is then compared to that determination. "Actually that testimony should be an input into a determination of ability to work." Goins v. Colvin, 764 F.3d 677, 681 (7th Cir. 2014). The ALJ did not make that mistake here. In any event, the Seventh Circuit has held that the use of boilerplate language "does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." Pepper, 712 F.3d at 368. The ALJ provided numerous, specific reasons in this case, as set forth above.

Plaintiff attacks several of the ALJ's reasons. First, he argues that the ALJ erred in finding that he failed to follow through on physical therapy. The ALJ, after noting Dr. Horner-Ibler's May 2011 statement that plaintiff failed to attend PT, acknowledged that plaintiff did later attend an evaluation in February 2012 but stated that he stopped after the first one to two visits. (Tr. at 16.) Plaintiff contends that the ALJ was wrong – he actually attended five sessions between February and May 2012. (Pl.'s Br. at 12, citing Tr. at 238, 350-55.) My review of the notes reveals that he attended four: a February 20, 2012, PT evaluation (Tr. at 355); a February 27, 2012 follow up, which he left early (Tr. at 353); a March 12, 2012 follow up, which was also limited because plaintiff was sick with the flu (Tr. at 352); and a March 26, 2012,

follow up, where the therapist showed him how to use the traction unit (Tr. at 350).[21] The ALJ's mistake in stating that plaintiff attended two sessions rather than four is the sort of minor error that does not require remand. See Henke v. Astrue, 498 Fed. Appx. 636, 641 (7th Cir. 2012); Berger v. Astrue, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ's point – that plaintiff failed to engage in dedicated PT – is supported by the record. (See Tr. at 339, 360.) On March 26, 2012, the physical therapist indicated that they would attempt different positioning at the following sessions (Tr. at 350), but it does not appear that plaintiff attended PT after that. Plaintiff speculates that perhaps he was not offered more sessions, but the ALJ could sensibly conclude otherwise given this evidence.[22]

Second, plaintiff faults the ALJ for relying on the lack of more aggressive treatment without considering that he lacked insurance. See Pierce v. Colvin, 739 F.3d 1046, 1050 (7th

---

[21]In his reply brief, plaintiff repeats the claim that he attended five sessions between February and May 2012, citing the same pages of the record. (Pl.'s Reply Br. at 3, citing Tr. at 238, 350-55.) However, I am unable to find any PT sessions after March 2012, and plaintiff provides no specific dates thereafter. Plaintiff does note that during an August 6, 2012, visit to Bread of Healing he told the doctor that he continued to do the back exercises he learned in physical therapy with minimal relief. (Tr. at 341.) However, the doctor apparently saw no need for a change, noting: "will continue w/ current management." (Tr. at 341.) Plaintiff also notes in his reply brief that during the February 20, 2012, evaluation, the therapist observed that he used a cane for mobility and had stiff transitions. (Tr. at 354.) The ALJ addressed this issue, noting that the cane was not prescribed, and that during the consultative exam Dr. Rebholz found that plaintiff was able to ambulate normally without it. (Tr. at 16, 214.)

[22]Plaintiff faults the ALJ for not asking him about this at the hearing. But plaintiff's representative could have explored the issue. Given Dr. Horner-Ibler's comment about plaintiff's lack of follow through with available therapy at the free clinic, it could hardly have come as a surprise that the ALJ would count this as a strike against plaintiff's credibility. See SSR 96-7p, 1996 WL 374186, at *7 ("[T]he individual's statements may be less credible if the . . . medical reports . . . show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). Plaintiff further argues in reply that, contrary to Dr. Horner-Ibler's prediction, physical therapy did not improve his condition. However, the ALJ found that records from the fall of 2012 "suggest[ed] improvement." (Tr. at 16.)

Cir. 2014) (reversing where the ALJ failed to consider whether the claimant's lack of insurance prevented her from seeking medical attention, which could explain her lack of objectively quantifiable test results).  As the ALJ noted, however, plaintiff was able to obtain treatment through a free clinic (Tr. at 16), and the providers there recommended conservative measures. See Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009) (finding that the ALJ could consider the claimant's "relatively conservative" treatment).  Plaintiff points to no evidence that more aggressive treatment was recommended, but he could not pursue it due to lack of funds or insurance.  This is not a case like Pierce, where the ALJ relied on sparse treatment without considering the fact that the claimant was uninsured and may not have been able to obtain more treatment.  Here, it was reasonable for the ALJ to find that plaintiff had access to treatment through free clinics but did not require more aggressive measures.

Finally, plaintiff faults the ALJ for relying on his daily activities.  As the Seventh Circuit has noted, this factor must be considered with care.  See Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); Bjornson, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.").  Plaintiff notes that the activities cited by the ALJ here – things like tending to personal care, preparing meals, doing housework, and visiting with friends – are modest and not necessarily inconsistent with disability.  Had this been the only reason the ALJ provided, remand might be warranted.  But the ALJ provided others, as noted above, and he did not place undue weight on plaintiff's daily

33

activities.  See Schreiber v. Colvin, 519 Fed. Appx. 951, 961 (7th Cir. 2013) (affirming where the ALJ did not place undue weight on activities of daily living and specified several valid reasons for finding the claimant not credible).  Plaintiff also criticizes the ALJ for failing to consider his strong work history prior to the alleged disability onset.  As noted, however, an ALJ is not required to consider every piece of evidence or testimony in the record.  See Pepper, 712 F.3d at 362.

The ALJ's credibility determination may not have been perfect, but it was not patently wrong.  Shideler, 688 F.3d at 312; see also Halsell v. Astrue, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("On balance, the flaws in the ALJ's reasoning are not enough to undermine the ALJ's decision that Halsell was exaggerating her symptoms.  Not all of the ALJ's reasons must be valid as long as enough of them are[.]"); Berger, 516 F.3d at 546 (noting that an ALJ's credibility assessment will stand as long as there is some support in the record).

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 14th day of November, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge